UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARTHUR W. SCHOFIELD,<br>    *Plaintiff*,<br>    *v.*<br>MICHAEL MAGREY & SCOTT MADORE,<br>    *Defendants.*[*] | Civil No. 3:12cv544 (JBA)<br><br>February 9, 2015 |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT AND TO STRIKE**

Defendants the Towns of South Windsor and Manchester (the "Towns"), Manchester Officer Michael Magrey and Sergeant Cleon Moses and South Windsor Officer Scott Madore and Chief Matthew Reed move [Doc. ## 75, 76, 79] for summary judgment on Plaintiff's claims arising from his involuntary seizure for medical treatment. For the reasons that follow, Defendants' motions are denied in part and granted in part.

I.      **Factual Background[1]**

On December 23, 2010, Arthur Schofield went to the Hartford Medical Group in Manchester, Connecticut, because he was suffering from an ache in his lung and sought a referral to a pulmonologist, believing that as a life-long smoker he might be suffering from lung cancer. (Schofield Dep., Ex. A to Manchester's Loc. R. 56(a)1 Stmt. [Doc. # 75-2] & Ex. A to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 86-1] at 47, 58; Underwood Dep., Ex. B to Manchester's 56(a)1, at 52.)   After hearing Mr. Schofield's symptoms, his treating physician, Dr. Michael Underwood, decided to perform a number of tests on Plaintiff and had his assistant Elizabeth Graves administer an electrocardiogram test. (Schofield Dep.

_____

[1] All facts in dispute are construed in the light most favorable to Plaintiff.  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

at 61–62.)  After viewing the results of the electrocardiogram, Dr. Underwood concluded that Mr. Schofield could be suffering from a "serious and potentially life-threatening" cardiac problem or a clot in his lungs that required "urgent treatment in a hospital emergency room" and further testing.  (Underwood Dep. at 48, 52; Schofield Dep. at 67.)

Dr. Underwood connected Mr. Schofield to an oxygen tank and he initially agreed to receive further testing at the hospital, but once Dr. Underwood explained that he would not be able to drive himself while attached to the oxygen machine and would have to be transported to the hospital by ambulance, Plaintiff refused to go, stating that he was not having a heart attack because he did not feel any pain near his heart.  (Schofield Dep. at 63, 67–69.)  Mr. Schofield took his coat and starting walking towards the exit when Dr. Underwood stopped him and explained that he would have to sign a form indicating that he was being discharged against medical advice.  (*Id.* at 70–72.)   As Mr. Schofield was walking towards his vehicle, paramedics arrived and Ms. Graves pointed at Mr. Schofield and said, "That's the gentleman you're supposed to be taking."  (Graves Dep., Ex. C to Manchester's 56(a)1, at 54.)

One of the paramedics approached Mr. Schofield and asked him if he was having a heart attack to which he responded, "I'm not having a heart attack, as you can see.  I'm standing right here.  I have no chest pains.  There's nothing wrong.  I don't need a hospital.  I'm just going to go home."  (Schofield Dep. at 76–77.)  Mr. Schofield then got into his car and started to drive to his home in South Windsor.  (*Id.* at 79–80.)  The paramedics called the Manchester Police Department and Officer Michael Magrey was dispatched.  (Magrey Dep., Ex. E to Manchester's 56(a)1, at 109–10.)  Upon his arrival at the Hartford Medical Group, Officer Magrey spoke with Ms. Graves, who said that Mr.

2

Schofield had been advised by the doctor to seek further medical treatment at the hospital but had instead driven home, and she provided Officer Magrey with Plaintiff's home address.  (Graves Dep. at 79–82, 33.)  Officer Magrey called the South Windsor Police Department and asked them to check on Mr. Schofield at his home and then drove towards Plaintiff's home, taking a route that he believed Mr. Schofield would follow, because he was concerned that Plaintiff might have a medically induced car accident. (Magrey Dep. at 119–24.)

About ten minutes after Mr. Schofield had returned home, South Windsor Police Officer Scott Madore and non-party Sergeant Glenn Buonanducci arrived at Plaintiff's home and Mr. Schofield spoke with them on his porch and explained that he had been to the doctor earlier but that he was not in need of further medical assistance and there was "nothing going on."   (Schofield Dep. at 80, 83, 88, 92.)   Mr. Schofield then turned around, took a can of beer from a table on his porch and went back into his living room and watched the news while drinking the beer.  (*Id.* at 89, 93–94.)  Sergeant Buonanducci, who is a certified emergency medical technician, determined that Mr. Schofield did not appear to be in medical distress and left Plaintiff's house.  (Buonanducci Dep., Ex. I to Pl.'s 56(a)2, at 11, 20–21.)  Officer Madore agreed that Mr. Schofield "wasn't exhibiting any signs of psychiatric or mental disorder" and remained outside the home until Manchester Officer Magrey arrived and told Magrey that Mr. Schofield had declined medical treatment.  (Madore Dep., Ex. M to Pl.'s 56(a)2, at 32–33.)

Officers Magrey and Madore again knocked on Plaintiff's door and Nancy Matthews, who at the time was Plaintiff's "ex-wife and life partner" (Am. Compl. ¶ 3),

answered.[2]  (Matthews Dep., Ex. F to Pl.'s 56(a)1, at 58.)  The officers explained that they were there to check on Mr. Schofield's welfare and Ms. Matthews said, "Come on in."  (*Id.* at 59.)  Mr. Schofield spoke with the officers in the hallway and again explained that there had been a mistake and he was not having a heart attack and did not need to go to the hospital.  (Schofield Dep. at 97–98.)  Officer Magrey then grabbed Plaintiff's arm, throwing him off balance, and said, "[y]ou are going to the hospital, and this is not up for discussion."  (*Id.* at 99–104.)  Mr. Schofield "tried to stop him," but Officer Magrey then "slammed" Mr. Schofield onto the ground face first, placing his weight on him and handcuffing him.  (*Id.*)  As Officer Magrey was bringing Mr. Schofield to the ground, Officer Madore grabbed Plaintiff's left arm and helped handcuff him.  (*Id.* at 106–07; Madore Dep. at 48.)

Officer Magrey then picked Plaintiff up off of the ground and placed him into the back of his patrol car until an ambulance arrived at which point Officer Magrey ordered him to get into the back of the ambulance or else he would "hog tie" him and forcibly put him inside.  (Schofield Dep. at 110, 115, 120.)  Mr. Schofield lied to the paramedics, telling them that he been to the doctor earlier in the day due to a stomach ache and providing a false name.  (*Id.* at 122–23.)  The paramedics then strapped Mr. Schofield to a gurney and transported him to the hospital.  (*Id.* at 124–25.)  Mr. Schofield was not arrested or charged with a crime.  (*Id.* at 108–10.)

---

[2] Plaintiff and Ms. Matthews have since remarried.

## II. Discussion[3]

### A. Fourth Amendment[4]

#### 1. Entry into Plaintiff's House

---

[3] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

[4] Plaintiff asserts three claims under 42 U.S.C. § 1983 for violations of the Fourth Amendment: (1) illegal entry into his house; (2) unlawful seizure; and (3) excessive force. Plaintiff also claims *Monell* municipal liability against the Towns and alleges violations of the Equal Protection Clause and a host of related state law claims. Defendants prudently have not moved for summary judgment on Plaintiff's excessive force claims or related state law claims for assault and battery. (Manchester Officers' Mem. Supp. [Doc. # 76-1] at 2–3.) Plaintiff's claims for violations of article first, §§ 7 and 9 of the Connecticut Constitution, common law invasion of privacy, and common law false imprisonment are all coextensive with the Fourth Amendment claims in this case. *See Saliby v. Kendzierski*, 407 F. Supp. 2d 393, 398 n.2 (D. Conn. 2006) (article first, §§ 7 and 9 and Fourth Amendment claims "are subject to the same analysis"); *Berg v. United States*, No. CIV 03-4642 MJD/JSM, 2007 WL 425448, at *8 (D. Minn. Feb. 2, 2007) (common law invasion of privacy claim established by violation of Fourth Amendment); *Green v. Donroe*, 186 Conn. 265, 267 (1982) ("False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another. Any period of such restraint, however brief in duration, is sufficient to constitute a basis for liability." (internal citations omitted)).

Plaintiff does not dispute that that Ms. Matthews invited the officers into their home, but contends that this invitation did not constitute valid consent as a matter of law, because the officers did not disclose to Ms. Matthews that they would involuntarily hospitalize Mr. Schofield if he refused medical treatment.

A warrantless search, although generally considered unreasonable, is permissible under the Fourth Amendment if conducted on the basis of consent of an authorized person. *United States v. Lewis,* 386 F.3d 475, 481 (2d Cir. 2004) (recognizing that "where authorized party consents to search neither a warrant nor probable cause is necessary"). Consent must be voluntary based on the "totality of the all the circumstances." *United States v. Snype,* 441 F.3d 119, 131 (2d Cir. 2006). If consent is given on the basis of "police misrepresentation of purpose," it is only invalid where it is so extreme that "a person is 'deprived of the ability to make a fair assessment of the need to surrender his privacy.'" *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 288 (S.D.N.Y. 2008) (quoting Wayne R. LaFave et al., *Criminal Procedure* § 3.10(c) (3d ed. 2007) (alterations omitted)).

Plaintiff has not offered any evidence that the officers were untruthful when they told Ms. Matthews that they wanted to check on Mr. Schofield's wellbeing. While the officers did not state that they would involuntarily seize Mr. Schofield if he refused medical care, as Plaintiff conceded at oral argument Ms. Matthews did not ask the officers any questions about their intentions before inviting them inside, and therefore there is no record evidence of police misrepresentation of purpose—much less the extreme level of misrepresentation that would vitiate consent. Therefore, Defendants' motion for summary judgment is granted as to the illegal entry claims.

6

2.      *Seizure for Involuntary Medical Treatment*

Plaintiff next claims that Defendants violated his Fourth Amendment right to be free of an unreasonable seizure by forcibly removing him from his home and transporting him to the hospital.  A warrantless seizure for purposes of involuntary hospitalization constitutes a seizure under the Fourth Amendment and may be done without a warrant only "'upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others."  *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (quoting *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir. 1993)). Because the Supreme Court has held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment," *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990), the mere exercise of this constitutional right cannot constitute evidence that a person is dangerous to himself or herself and in need of involuntary hospitalization, *see Green v. City of New York*, 465 F.3d 65, 84 n.13 (2d Cir. 2006).

Defendant Magrey contends that the analysis of the reasonableness of a warrantless seizure for involuntary medical treatment is "very state-specific" (Manchester Officers' Mem. Supp. [Doc. # 76-1] at 7) and that his actions were justified under Conn. Gen. Stat. § 17a-503(a), which provides:

> Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section.

Although all parties have analyzed the propriety of Defendants' actions under Connecticut law, whether or not a seizure "'is reasonable within the meaning of the Fourth Amendment' . . . has never 'depend[ed] on the law of the particular State in which [it] occurs," because "state law [does] not alter the content of the Fourth Amendment." *Virginia v. Moore*, 553 U.S. 164, 172 (2008) (quoting *California v. Greenwood*, 486 U.S. 35 (1988) (second alteration in original)); *see also Wren v. United States*, 517 U.S. 806, 815 (1996) ("We cannot accept that the search and seizure protections of the Fourth Amendment are so variable" as to depend on state law).[5]

Nevertheless, Conn. Gen. Stat. § 17a-503(a) mirrors the requirements imposed by the Fourth Amendment, which like Connecticut law, allows a warrantless seizure for involuntary medical treatment or a psychiatric evaluation "'only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." *Anthony*, 339 F.3d at 137. Officer Magrey contends that it is "clear that Mr. Schofield had a psychiatric disability" (Manchester Officer's Mot. at 14–15) and "was a danger to himself or others," because Plaintiff "drove home despite doctor's orders that he should go to the hospital, possibly endangering himself and others on the road" and then

---

[5] Cases that have addressed state statutes regarding involuntary medical treatment have done so in the context of the Due Process Clause which "demand[s] that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy." *Rodriguez v. City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995). Plaintiff's claim is not one for involuntary medical treatment but rather that the officers involuntarily seized him to transport him to the hospital. *See Green v. City of New York*, 465 F.3d 65, 85 (2d Cir. 2006) ("We do not believe that the mere act of transporting a person to the hospital constitutes treatment. Rather, this action is more properly considered as a seizure under the rubric of the Fourth Amendment."). Plaintiff confirmed at oral argument that he is not pursuing any due process claims under the Fourteenth Amendment.

consumed a beer at home despite potential cardiac issues, all of which demonstrates that he was "was still engaging in self-destructive dangerous behavior" (Manchester Officers' Reply [Doc. # 96] at 3).  Defendant Magrey maintains that Plaintiff's "inconceivable . . . . response to the news of a possible health crisis, whether founded or not, was not the typical response and as such was alarming" and "sufficient to provide probable cause." (*Id.* at 4.)

A reasonable jury could readily disagree with Magrey's conclusions.  Whether or not Plaintiff could have presented a danger to himself or others by driving home despite his medical condition, it is undisputed that Defendants did not seize Plaintiff before he got into his vehicle or while he was driving but only when he was inside his home watching television with no apparent sign of distress.[6]  At the time of the seizure, there is at the very least a genuine dispute of material fact as to whether Mr. Schofield could have presented a risk to himself or others.  While Magrey contends that Mr. Schofield's initial refusal of medical treatment demonstrated that he was a danger to himself and suffering from a mental illness, the Second Circuit has made clear that because a competent adult has a right to refuse medical treatment, the danger posed by an underlying condition does not justify an involuntary seizure.  *See Green*, 465 F.3d at 84 ("Whether or not Walter was

---

[6] Furthermore, there is a dispute of fact as to whether Mr. Schofield was at risk while driving home.  Dr. Underwood testified that although Mr. Schofield "could" have been a danger to himself or others if he suffered from a cardiac episode while driving, he was "not an imminent danger" at the time he drove home because he was not having seizures or losing consciousness.  Dr. Underwood recommended that Mr. Schofield not drive himself to the hospital principally because an ambulance would have been faster and would have allowed for paramedics to administer oxygen and monitor him while he was in transit.  (Underwood Dep. at 80–81.)

in extremis, the officers could not have seized him if he competently and voluntarily declined treatment."). It necessarily follows that Plaintiff's exercise of his constitutional right to refuse medical treatment is not a basis for concluding that Plaintiff was suffering from a mental disability that would justify involuntary seizure.

Officer Madore contends that he is not liable for the involuntary seizure because the decision to seize Plaintiff was made by Officer Magrey, and Madore did not conduct an independent assessment of probable cause but rather "[went] along with" the assessment of a "brother officer" who had determined that there was probable cause for a seizure. (Madore Dep. at 32.) An officer is not liable under § 1983 on the basis of his "direct physical participation" in the constitutional violation alone "if the defendant had no awareness or notice of the facts that rendered the action illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001). However, where a defendant has "knowledge of the facts that rendered the conduct illegal," he may be liable even where his participation in the illegality is only "'indirect'—such as ordering or helping others to do the unlawful acts, rather than doing them him—or herself." *Id.* (footnote omitted). Even if Officer Madore did not make the final decision to seize Plaintiff, he used physical force to assist Officer Magrey in handcuffing Plaintiff (Schofield Dep. at 106–07; Madore Dep. at 48), and a reasonable jury could conclude that he is liable for participating in this seizure despite knowing that Plaintiff had repeatedly declined medical treatment and was not exhibiting any signs of psychiatric or medical disorder (Madore Dep. at 32–33).

Therefore, summary judgment is denied as to Defendants Magrey and Madore on the involuntary seizure claim.

3.    *Qualified Immunity*

Officers Magrey and Madore next contend that even if a jury could determine that they lacked probable cause for the seizure, they are nevertheless entitled to qualified immunity.  Qualified immunity is available if (1) the defendants did not violate clearly established law or (2) it was objectively reasonable for the defendant to believe that their actions did not violate such law.  *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir.2007).  Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Zieper v. Metzinger*, 474 F.3d 60, 71 (2d Cir. 2007) (internal quotation marks omitted).

As discussed above, there are disputed facts material to the determination of whether Plaintiff was exercising his constitutional right as a competent adult to be free from involuntary seizure for medical treatment.  Defendants contend that this right was not clearly established because "there are no Second Circuit or Supreme Court cases that even remotely deal with the specific facts and context of this case."  (Manchester Officers' Mem. Supp. at 22.)  But there is no requirement that the factual circumstances of a constitutional deprivation be "fundamentally similar" to those of a precedent applying that right and "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Supreme Court has "repeatedly told courts . . .  not to define clearly established law at a high level of generality," because the "general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of

little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011).  Here, the right is not simply to be free of an unreasonable warrantless seizure absent probable cause, but rather the right to not be seized for unwanted medical care absent probable cause that the person could be a danger to himself or others.  This right is clearly established law.  *See Glass,* 984 F.2d at 58; *Green*, 465 F.3d at 83 ("We hold that it was clearly established . . . that a competent adult could not be seized and transported for treatment unless she presented a danger to herself or others.").

A defendant is nevertheless entitled to summary judgment on qualified immunity "if he adduces sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (internal quotation marks and alterations omitted).

An officer's decision to make a warrantless seizure is objectively reasonable "if there was 'arguable' probable cause . . . that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013) (quoting *Jenkins v. City of New York,* 478 F.3d 76, 86–87 (2d Cir. 2007)).  However, arguable probable cause "should not be misunderstood to mean 'almost' probable cause" and if "officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer."  *Id.* (quoting

*Jenkins*, 478 F.3d at 86–87).  "If there is a material question of fact as to the relevant surrounding circumstances, the question of objective reasonableness is for the jury." *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir. 2004).

In *Green*, the Second Circuit held that qualified immunity did not shield a fire department lieutenant from potential liability for an unlawful seizure where the plaintiff's family called 911 to report that the plaintiff was suffering from ALS, had lost consciousness, was having trouble breathing and appeared to be dying.  465 F.3d at 70. The plaintiff's family was able to revive him on their own and he regained consciousness before emergency personnel arrived.  Although the plaintiff had been unable to speak even before this incident due to his condition, he communicated through blinking and a computer program that he was feeling better and did not need or want medical treatment. *Id.*  Although the plaintiff's family members conveyed this information to the defendant, the defendant insisted on transporting the plaintiff to the hospital, contending that the plaintiff was not competent to refuse medical treatment and was "in extremis." *Id.* at 83.

The Second Circuit held that the lieutenant was not entitled to summary judgment on qualified immunity because there was substantial evidence that the plaintiff was competent to refuse medical treatment, albeit non-verbally, and "[w]hether or not [the plaintiff] was in extremis, the officers could not have seized him if he competently and voluntarily declined treatment." *Id.* at 83–84 (citing *Cruzan,* 497 U.S. at 278).  Here too there are factual disputes relevant to qualified immunity that preclude summary judgment and looking at the evidence in the light most favorable to Plaintiff and drawing all inferences in his favor, a jury could conclude that it was objectively unreasonable for Defendants to conclude that there was probable cause that Mr. Schofield was under a

mental disability and presented a danger to himself or others on the basis of his decision to decline treatment where he was peaceably watching television in his living room and exhibiting no signs of distress.[7]  *See Hartline*, 546 F.3d at 102.  Therefore, summary judgment is denied on the basis of qualified immunity.

### B.    *Monell* Claims

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978)).

The Supreme Court has interpreted § 1983's causation requirement as being inconsistent with the imposition of vicarious or *respondeat superior* liability on a municipality for the torts of its employees, *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007), and thus "[t]he fifth element—the 'official policy' element—can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort,'" *Roe*, 542 F.3d at 36 (quoting *Monell*, 436 U.S. at 691).  "'In other words, a municipality may not be found liable simply because one of its employees committed a tort'" and "a plaintiff must demonstrate that, through its deliberate conduct, the

---

[7] Officer Madore acknowledged that Mr. Schofield did not exhibit any signs of mental disorder that would make him incompetent to refuse medical treatment or could present a risk to himself (Madore Dep. at 32) but erroneously believed that he could involuntarily hospitalize Plaintiff on the basis of the danger presented to him by the underlying medical condition (*id.* at 14).

municipality was the 'moving force' behind the alleged injury." *Id.* at 36–37 (quoting *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1997)).

Although Plaintiff attempts to articulate various theories of liability under *Monell* (Pl.'s Opp'n to Manchester [Doc. # 86] at 9–26; Pl.'s Opp'n to South Windsor [Doc. # 88] at 8–26), they amount to only two distinct theories: that municipal policy makers were deliberately indifferent to (1) a failure to adequately train their police officers and (2) a failure to discipline or supervise officers.[8]  *See Walker v. City of New York*, 974 F.2d 293, 296–97 (2d Cir. 1992) (noting that *Monell*'s requirement that plaintiffs "allege actual conduct by a municipal policymaker . . . . necessarily molds many § 1983 claims against municipalities into 'failure to train' or 'failure to supervise' claims.  It is only by casting claims in this way that plaintiffs can link an actual decision by a high level municipal official to the challenged incident.").

---

[8] Plaintiff's contention that the Towns had unconstitutional formal policies on involuntary seizure for medical treatment is a failure-to-train claim because he does not assert that the policies are facially invalid but rather that officers were provided with insufficient training on applying general principals.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 386–87 (1989) ("[If a] valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train").  Likewise, Plaintiff's claim that Officers Magrey and Madore were municipal policymakers because they were "left . . . to interpret a legal statute on their own" (Pl.'s Opp'n at Manchester at 13; Opp'n to South Windsor at 14) also amounts to a failure-to-train or supervise claim, because neither officer was actually a municipal policymaker or supervisor.  *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).  Finally, Plaintiff's contention that there was a widespread practice of constitutional violations in the Towns is articulated as a failure "to investigate, supervise, train, and discipline" officers and thus is not a distinct theory.  (Pl.'s Opp'n to Manchester at 14.)

1.      *Failure to Train*

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). The Supreme Court has explained that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train" because municipal liability depends upon a showing of policymakers' "deliberate indifference" to citizens' rights rather than negligence. *Id.* Therefore, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," because "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 1360. In addition, at the summary judgment stage, plaintiffs must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)

In *Green*, the Second Circuit upheld the dismissal on summary judgment of a claim that New York City failed to adequately train medical personnel on the protocol for assessing a person's competence to refuse medical aid for two reasons: (1) there was no admissible evidence of any problem with medical professionals' response and (2) "and more important, the City did not fail to fulfill any training obligation it may have had. It

16

provided personnel with guidelines that specifically and clearly informed them that they had to evaluate non-verbal refusals of medical treatment.  Without evidence that these provisions were ignored prior to the incident at issue in this lawsuit, a reasonable jury could not find that the City had a further training obligation."  465 F.3d at 82.

As in *Green*, Plaintiff has offered no evidence of any problem with illegal involuntary hospitalizations in Manchester or South Windsor to support an inference that policymaking officials have exhibited "deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,'" and "that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.'" *Amnesty Am.*, 361 F.3d at 126 (quoting *City of Canton*, 489 U.S. at 388).  While Officers Madore and Magrey both testified that they had involuntarily seized others in the past (Magrey Dep. at 169–70; Madore Dep. at 20), there is no record evidence that the officers acted improperly in those cases and or that any other officers had done so.[9]  *See Connick*, 131 S. Ct. at 1360 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional right.").

Plaintiff cannot predicate his failure-to-train claim solely on Defendants' asserted improper seizure of him because a single incident of misconduct does not demonstrate inadequate training and is not inconsistent with "the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training" and

_____

[9] In the past ten years there have been no civilian complaints against Manchester police officers for improper emergency committals.  (Dunnigan Aff. ¶ 10, Ex. H to Manchester's 56(a)1).

"*City of Canton* unequivocally requires . . . that the factfinder's inferences of inadequate training and causation be based on more than the mere fact that the misconduct occurred in the first place." *Amnesty Am.*, 361 F.3d at 130–31.

The absence of any record evidence of a problem with involuntary seizures for medical treatment mandates the dismissal of Plaintiff's *Monell* claim because there is no evidence from which a jury could reasonably infer that policymakers' were deliberately indifferent to constitutional violations.  Furthermore, this claim cannot survive for the additional reason that Plaintiff has proffered no admissible evidence that the Towns' training programs were inadequate and "[i]t is impossible to prevail on a claim that [a] training program was inadequate without any evidence as to . . . how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted under the circumstances' to remove passively resisting protesters." *Amnesty Am.*, 361 F.3d at 130 (quoting *City of Canton,* 489 U.S. at 391).

Although Manchester did not have a specific policy to guide officers on involuntary committals, Officer Magrey received training at the police academy on committals pursuant to § 17a-503, attended a week-long crisis intervention training, and completed additional courses in dealing with individuals with mental illness and emergency committals.  (Magrey Dep. at 50–54, 58–59; Montminy Aff., Ex. G to Manchester's 56(a)1, ¶¶ 13–15.)  Aside from claiming that misconduct occurred in this case, Plaintiff has not offered any evidence of how this training was inadequate.

South Windsor failed to cite any evidence of Officer Madore's training in its briefing and Officer Madore testified that he did not recall receiving any training himself

on § 17a-503 committals.  Likewise, South Windsor does not dispute that it did not maintain a policy for § 17a-503 committals and that Officer Madore relied only on the Department's use of force policy.[10]  (Pl.'s Opp'n to South Windsor at 9.)  If in fact South Windsor had provided Officer Madore with no training on involuntary seizures for medical treatment and had no policy on the subject, Plaintiff might be able to reach a jury on a failure to train theory if there were also evidence of a widespread problem, because "[i]n some cases, such as the use of deadly force, the risk to the public is so obvious and so great that failure to train on the applicable constitutional limitations constitutes deliberate indifference as a matter of law." *Green*, 465 F.3d at 80 (quoting *City of Canton,* 489 U.S. at 388)); *see also Walker*, 974 F.2d at 298 ("Walker alleges that the police department had no policy on the proper handling of exculpatory evidence.  If true, this might, in the proper case, provide the basis for a deliberate indifference claim under the standards laid out above.").

However, there is record evidence that Officer Madore received at least some training on § 17a-503, because as a police officer he was required to receive training and certification from the State of Connecticut Police Officer Standards & Training Council ("POST").  *See* Conn. Gen. Stat. § 7-294d ("No person may be employed as a police

---

[10] Plaintiff asserts that South Windsor lacked such a policy because when Defendant Madore was asked to bring the Department's policy on the implementation of § 17a-503 to his deposition, he brought only the use of force policy and when he was asked if the Department had a policy on committals, he responded "I have the law printed out."  (Madore Dep. at 7.)  While Officer Madore did not directly state that the Department lacked a policy on committals, South Windsor does not dispute that none existed and instead maintains that the "absence of an officially promulgated policy does not itself constitute a policy" under *Monell.*  (South Windsor Reply [Doc. # 97] at 5.)

officer by any law enforcement unit . . . unless such person has been certified [by POST].").   Officer Magrey testified at his deposition that officers are trained in the police academy that competent adults have the right to refuse medical treatment.   (Magrey Dep. at 49–50.)   While Officer Madore did not recall receiving such training (Madore Dep. at 16–17), Plaintiffs have not adduced any evidence that this training was not part of Officer Madore's curriculum at the police academy.   Without evidence of how this training was conducted or how it was inadequate and no evidence of prior incidents of unconstitutional conduct which would have made the need for further training apparent, Plaintiff cannot prevail on this claim.   *See Amnesty Am.*, 361 F.3d at 130.

2.      *Failure to Discipline and Supervise*

Plaintiff's failure to discipline and supervise claim is based on the fact that Officers Magrey and Madore had previously involuntarily committed people pursuant to § 17a-503 and Manchester's failure to adequately investigate and discipline Officer Magrey for his actions in this case.   (Pl.'s Opp'n to Manchester at 14–15, 23, 25; Opp'n to South Windsor at 24.)   However, Plaintiff has offered no evidence that Magrey, Madore, or any other officers *misapplied* § 17a-503 before this incident and thus no reasonable jury could conclude that there was pattern of unconstitutional seizures for unwanted medical treatment that required discipline.

The lack of discipline given to Officer Magrey for his conduct in this case is irrelevant to this inquiry because for Manchester to be liable for inadequate discipline, Plaintiff must show that the Town's inaction caused his injuries, which he cannot show in relation to discipline that he contends should have been imposed after his injuries were sustained.   *Cf. Vann v. City of New York*, 72 F.3d 1040, 1051 (2d Cir. 1995) ("[I]t would

20

be entirely permissible for the jury to find that the Department's restoration of Morrison to full-duty status and its indifference to the postreinstatement civilian complaints against him caused him to feel entitled, whether on duty or off, to compel the 'respect' he demanded through the use of violence."); *see also Blount v. Swiderski*, No. 2:03CV23 (ENV), 2006 WL 3314635, at *14 n.6 (E.D.N.Y. Nov. 14, 2006) ("The defendant-supervisors' failures in an after-the-fact investigation cannot, standing alone, be said to have caused the underlying deprivation of rights, and thus cannot be a basis of supervisory liability.").

Accordingly, the Towns' Motions are granted as to the *Monell* claims.

## C.   Claims Lacking Personal Involvement

It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation. *Grullon v. City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013). The Second Circuit has held that

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).

Plaintiff contends that Manchester Sgt. Moses is liable for his failure to supervise Defendant Magrey.   (Pl.'s Opp'n Manchester Officers at 21–22.)   However, it is undisputed that Sgt. Moses was not present at Plaintiff's home or the Hartford Medical Group (Moses Aff., Ex. G to Manchester Officers' 56(a)1 ¶¶ 6–7) and his involvement in this case was limited to providing Officer Magrey with approval to leave the jurisdiction of Manchester to visit Plaintiff's home in South Windsor (Magrey Dep. at 168).   Plaintiff has offered no evidence that Sgt. Moses was personally involved in or aware of any constitutional violation.   Therefore, all claims against Sgt. Moses are dismissed.

As to Chief Reed of South Windsor, it is undisputed that he was not personally involved in Plaintiff's seizure.   (Reed Aff., Ex. C to South Windsor's 56(a)1, ¶¶ 3–4.) Plaintiff contends that Chief Reed is liable for his failure to discipline Officer Madore for his conduct in this case, but as discussed above, any such failure to discipline after the fact cannot have caused Plaintiff's injuries and therefore is not actionable under § 1983. Accordingly, all claims against Chief Reed are dismissed.[11]

D.   **Equal Protection**

Plaintiff asserts a "class of one" equal protection claim against Officer Magrey, contending that targeted Plaintiff "for discriminatory treatment" because of "ill will" or "spiteful effort to 'get' him."   (Pl.'s Opp'n to Manchester Officers at 18–19.)   While generally equal protection claims are concerned with differential treatment between classes of individuals, the Supreme Court has recognized equal protection claims brought

---

[11] While an official capacity claim against Chief Reed could "represent . . . another way of pleading an action against an entity of which an officer is an agent," *Monell*, 436 U.S. at 691 n.55, the Court has already dismissed [Doc. # 58] all official capacity claims as unnecessary in light of Plaintiff's direct claims against the Towns.

by a "'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010) (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)).  "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Id.* at 59 (quoting *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir. 2006)).  "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Id.* at 59–60 (quoting *Clubside*, 468 F.3d at 159).

As comparators, Plaintiff posits three other instances in which Officer Magrey was "able to talk someone who was psychiatrically disabled out of doing something dangerous or harmful" without resorting to involuntary seizure for medical treatment as he did with Plaintiff.  (Magrey Dep. at 64.)  As Plaintiff acknowledged at oral argument, there is no record evidence regarding the details of these purported comparators and thus there is no basis for comparison with Plaintiff or evidence from which a reasonable jury could infer Defendant Magrey's intent as to Plaintiff.  Therefore, the equal protection claims are dismissed.

**E.      State Law Claims[12]**

      *1.      Negligence and Negligent Infliction of Emotional Distress*

The Towns contend that they are entitled to summary judgment on Plaintiff's claims for negligence and negligent infliction of emotional distress on the basis of governmental immunity, which provides that "a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."  Conn. Gen. Stat. § 52-557n(a)(2)(B).

Plaintiff concedes that the officers were engaged in discretionary functions when they seized him but contends that the "identifiable person/imminent harm exception" exception applies because "the circumstances [made] it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent

---

[12] At oral argument, Plaintiff confirmed that he is not pursuing any federal due process claims and, as set forth above, his equal protection claims fail.  While Plaintiff has not abandoned his state law claims, he cites no case in which a Connecticut court has recognized a private cause of action for monetary damages under the due process and equal protection provisions of article first, §§ 1, 8, 20 of the State Constitution, and courts in this state have consistently declined to do so.  *See Marinella v. Town of Darien*, No. 3:07-CV-910 (CFD), 2010 WL 3123298, at *5 (D. Conn. Aug. 9, 2010) ("Connecticut federal and state court decisions have similarly held that no private cause of action for monetary damages is available for due process claims under the Connecticut State Constitution." (collecting cases)); *McKiernan v. Amento*, No. CV010453718S, 2003 WL 22333200, at *5 (Conn. Super. Ct. Oct. 2, 2003) (Gilardi, J.) ("[T]he Connecticut Supreme Court has expressly declined to recognize a private cause of action based on a violation of § 8, the due process clause of the Connecticut constitution, and no appellate court or trial court in this state has recognized a cause of action for monetary damages under article first, § 1 of the state constitution." (citing *Kelley Prop. Dev., Inc. v. Town of Lebanon*, 226 Conn. 314, 314 (1993)) (internal alterations & quotation marks omitted)).  Therefore, these claims are dismissed.

harm." *Spears v. Garcia*, 263 Conn. 22, 36 (2003) (internal quotation marks omitted). The Connecticut Supreme Court has emphasized that this exception "has received very limited recognition in this state." *Grady v. Town of Somers*, 294 Conn. 324, 350 (2009) (internal quotation marks omitted).

Plaintiff contends that the exception applies because Officer Magrey "failed to conduct a reasonable investigation before physically assaulting an innocent man and forcing him to accept medical treatment he didn't want and didn't need." (Pl.'s Opp'n to Manchester Officers at 21.)  While Plaintiff frames his claims against Officer Magrey in terms of a failure to conduct an adequate investigation, it is apparent that the gravamen of Plaintiff's claims is not Officer Magrey's failure to act, but rather the actions that he did take in seizing Mr. Schofield.

The basis for the imminent harm exception, however, is that "under Connecticut law, a specific duty may arise, and a claim for negligence will survive the common law immunity defense, where a police officer is aware of an imminent danger to an identifiable person and where the officer breaches that duty by failing to intervene and 'act as a skilled policeman.'" *Villano v. Sacco*, No. 3:09-CV-1334 (JCH), 2011 WL 1584851, at *8 (D. Conn. Apr. 26, 2011) (quoting *Sestito v. City of Groton,* 178 Conn. 520, 528 (1979) and citing *Shore v. Town of Stonington*, 187 Conn. 147, 154 (1982)).  As Plaintiff acknowledges, he has not challenged a negligent failure to act and while he contends that the exception should not be limited to negligent omissions, he cites no case in which a court has done so.  (*See* Pl.'s Opp'n to Manchester Officers at 30.)  Doing so would be inconsistent with the narrowness of the exception and would swallow the

general rule of immunity for discretionary functions. Accordingly, the negligence claims against the Towns are dismissed.

To the extent that Plaintiff asserts claims against the individual defendants in their personal capacities, rather than the Towns, Conn. Gen. Stat. § 4-165 applies, which provides: "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment." While Plaintiff can proceed with claims caused by "wanton, reckless or malicious" conduct, by their very definition such claims do not sound in negligence and therefore, Plaintiff's negligence-based claims against Defendants Magrey and Madore must be dismissed.[13]  *See Hamilton v. Lajoie*, 660 F. Supp. 2d 261, 265–66 (D. Conn. 2009) ("[Defendant] contends that his negligence claim should be allowed to proceed because it is for a jury to determine whether the Defendants' conduct was 'wanton, reckless or malicious.' This distinction goes to the very definition of a claim for negligence: if the Defendants acted wantonly, they may be held liable for committing some other tort, but not for negligence.").

Plaintiff can proceed with his claim for "Recklessness and Maliciousness" (Count 27) and other state-law claims that are not based in negligence against Defendants

---

[13] This includes his claim for gross negligence. *See Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314, 337 (2005) ("Connecticut does not recognize degrees of negligence and, consequently, does not recognize the tort of gross negligence as a separate basis of liability.").

Magrey and Madore.[14]  *See Warner v. Leslie-Elliott Constructors, Inc.*, 194 Conn. 129, 138 (1984) ("It is well established that causes of action for negligence and '[willful] or malicious conduct' are separate and distinct causes of action.").

    2.    *Indemnification*

Under Connecticut law, municipalities are required to indemnify employees, who while acting within the scope of their employment and performance of official duties, become liable for a civil rights violation, provided that the violation is not willful.  Conn. Gen. Stat. § 7-465(a).  A necessary predicate to an indemnification claim is "a prior finding of individual negligence on the part of the employee."  *Tyson v. Willauer*, 290 F. Supp. 2d 278, 288 (D. Conn. 2003) (citing *Wu v. Town of Fairfield,* 204 Conn. 435, 438 (1987)).  Defendants contend that they are entitled to summary judgment on the indemnification claim because Plaintiff "cannot as a matter of law establish his negligence claims against the defendants, since the defendants are shielded by governmental immunity."  (Manchester Officers' Mem. Supp. at 35.)  While the state-law negligence claims against Officers Magrey and Madore have been dismissed, Plaintiff's § 1983 claims against them survive and thus so too does Plaintiff's claim for indemnification for compensatory damages on this count.  *See George v. Town of E. Hartford*, No.

---

    [14] To the extent that Plaintiff asserts these claims against the Towns, they are barred by governmental immunity.  *See* Conn. Gen. Stat. § 52-557n(a)(2) ("[A] political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct."); *Dubay v. Irish*, 207 Conn. 518, 533 (1988) ("While we have attempted to draw definitional distinctions between the terms wilful, wanton or reckless, in practice the three terms have been treated as meaning the same thing.").

3:97CV1958 (RNC), 2000 WL 436605, at *2 (D. Conn. Mar. 13, 2000) ("Because the plaintiff's § 1983 excessive force claims survive against both Proulx and Furlong, his claims for municipal indemnification against the Towns of East Hartford and Glastonbury based on the underlying excessive force claims also survive."); *City of W. Haven v. Hartford Ins. Co.*, 221 Conn. 149, 164 (1992) (holding that § 7-465(a) does not require municipalities to indemnify employees for punitive damages under § 1983).

### 3.   *Intentional Infliction of Emotional Distress*

A claim for intentional infliction of emotional distress requires:  "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (internal quotation marks omitted).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine.  Only where reasonable minds disagree does it become an issue for the jury." *Id.* (internal quotation marks omitted).

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against

28

the actor, and lead him to exclaim, 'Outrageous!'"   *Id.* (internal quotation marks, citations, and alterations omitted).

A reasonable jury could conclude that Defendants' conduct was sufficiently outrageous when they entered Plaintiff's home, forced him to receive unwanted medical treatment in contravention of his well-established constitutional right to decline such treatment, disregarded signs that Mr. Schofield was not in medical distress, and used excessive force to further this unlawful seizure despite believing that Mr. Schofield was at imminent risk of a heart attack, which risk would likely have been exacerbated by the physical confrontation and stress.[15]

### 4.   *Abuse of Process*

"Abuse of process is the misuse of process regularly issued to accomplish an unlawful ulterior purpose." *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 256 Conn. 343, 361 n.16 (2001) (quoting *Schaefer v. O.K. Tool Co.,* 110 Conn. 528, 532, 148 A. 330 (1930)). Plaintiff's claim for abuse of process fails as a matter of law because it is undisputed that Plaintiff was not arrested and no legal action was initiated against him and therefore there was no judicial process that could have been abused.  *See Larobina v. McDonald*, 274 Conn. 394, 406–07 (2005) ("[T]o prevail on an abuse of process claim, the plaintiff must establish that the defendant used a *judicial process* for an *improper purpose.*" (emphasis in original)).

---

[15] Defendants do not dispute that Plaintiff suffered severe emotional distress.  *Cf.* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant *shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (emphasis added)).

5.      *Civil Conspiracy*

"There is no independent claim of civil conspiracy" but only an action "for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself.  Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort."  *Larobina v. McDonald*, 274 Conn. 394, 408 (2005) (internal quotation marks and alterations omitted).  Plaintiff, however, has alleged only that the "conduct described in the Complaint constitutes an actionable civil conspiracy" between Defendants Magrey and Madore to among other things unlawfully seize Plaintiff "which entitles him to recover from the Defendants compensatory damages and exemplary damages."  (Am. Compl. ¶¶ 275–76.)  Plaintiff has not shown that there was any substantive tort that one of the defendants committed for which the other should be held liable but instead has alleged that Defendants Magrey and Madore are equally responsible for the claims asserted.  Therefore, Plaintiff's claim for civil conspiracy liability is dismissed.  *See Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 104, 107 (D. Conn. 2010) ("The purpose of a civil conspiracy claim is to impose liability on all those who agreed to join the conspiracy.  By joining, the members become legally responsible for the tortious acts taken in furtherance of the object of the conspiracy, including those taken by coconspirators.").

6.      *Kidnapping*

Plaintiff does not cite any cases in which a court has recognized a civil cause of action for kidnapping and the Court has not located any Connecticut cases that have

done so.   Therefore, in the absence of any indication that Connecticut recognizes a private cause of action, the claims for kidnapping are dismissed.[16]

F.      **Motions to Strike**

Defendants move [Doc. ## 94, 98] to strike the deposition testimony of Marshall Segar (Exs. K, O to Pl.'s 56(a)2; Ex. A to Manchester's Mot. Strike) and the expert report of Eric Daigle (Ex. L to Pl.'s 56(a)2).  While "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997), as this Court has previously noted, "[n]otwithstanding litigants' frequent use of motions to strike portions of the opponent's Local Rule 56(a) Statement, and evidence in support, Local Rule 56 neither authorizes such motions nor contemplates them as an appropriate remedy for a violation of the rule," *Ricci v. Destefano*, No. 3:04 CV 1109 (JBA), 2006 WL 2666081, at *2 (D. Conn. Sept. 15, 2006).

Rather, a party should state its objections to the admissibility of evidence presented at summary judgment in its briefing and the Court will rely only upon admissible evidence in ruling on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  Thus, motions to strike

---

[16] Even if such a claim were recognized in Connecticut, in the criminal context "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime."  *State v. Salamon*, 287 Conn. 509, 542 (2008).  There is no evidence that Defendants intended to abduct Plaintiff for any period of time or to a greater degree than necessary to commit the other alleged wrongs, seizure for involuntary medical treatment.  Therefore, even if recognized, a kidnapping claim would fail on the merits.

"are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion."  *Ricci*, 2006 WL 2666081, at *3.

Accordingly, Defendants' Motions to Strike are denied as moot, both because a motion to strike is neither authorized nor necessary and because this Court has not relied upon the objected-to evidence in this Ruling.  *See Radolf v. Univ. of Conn.*, 364 F. Supp. 2d 204, 230 (D. Conn. 2005) ("In reaching its decision on the two motions for summary judgment, the Court did not rely on this material that Defendants seek to strike. Therefore, Defendants' Motions to Strike are denied as moot."); *Waananen v. Barry*, 343 F. Supp. 2d 161, 172 (D. Conn. 2004) (denying motion to strike as moot "because none of the challenged exhibits were relevant to the Court's decision on summary judgment").

III.    **Conclusion**

In summary, for the reasons set forth above, the Town of Manchester's Motion [Doc. # 75] for Summary Judgment is GRANTED; the Motion [Doc. # 76] of Defendants Magrey and Moses is GRANTED as to Moses and GRANTED in part and DENIED in part as to Magrey; the Motion [Doc. # 79] of Defendants Madore, Reed, and the Town of South Windsor is GRANTED as to Reed and the Town of South Windsor and GRANTED in part and DENIED in part as to Madore.  The Motions [Doc. ## 94, 98] to Strike are DENIED as MOOT.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 9th day of February, 2015.

----

˙ The Clerk is directed to amend the case caption to conform to the above to reflect the parties who remain in this action.